305 N.Y. 119 (1953)
Meyer Bank et al., Copartners Doing Business under the Name of Bank Electric Co., Appellants,
v.
Board of Education of the City of New York, Respondent.
Court of Appeals of the State of New York.
Argued December 3, 1952.
Decided March 5, 1953
Nelson Rosenbaum for appellants.
Denis M. Hurley, Corporation Counsel (Andrew Bellanca and Seymour B. Quel of counsel), for respondent.
LOUGHRAN, Ch. J., CONWAY, DYE, FULD and FROESSEL, JJ., concur with LEWIS, J.; DESMOND, J., dissents in opinion.
*123 LEWIS, J.
We are to determine whether actionable constructive fraud was proven by the plaintiffs in connection with the award to them by the defendant of one of four separate contracts for the construction of an addition to a public school building.
By constructive fraud is meant "* * * an act done or omitted, not with an actual design to perpetrate positive fraud or injury upon other persons, but which, nevertheless, amounts to positive fraud, or is construed as a fraud by the court because of its detrimental effect upon public interests and public or private confidence." (Eaton on Equity, § 125; and see 1 Story, Equity Jurisprudence [13th ed.], § 258, p. 265.) That concept will give direction to our inquiry.
A chronological statement of facts from the record will contribute to an understanding of our problem: On June 13, 1946, the board of estimate of the city of New York, at the request of the defendant board of education, approved plans for an addition to Public School 35 in Brooklyn. The total estimated cost of that project was $960,000, which amount was authorized as a charge against the current capital budget appropriation of $1,322,196.87 allotted to that school improvement. Such approval by the board of estimate, as shown by its minutes, contained a provision that if the total of the low bids received in *124 connection with the project exceeded the aggregate estimate of cost, no contracts would be let without resubmission to the board of estimate for subsequent approval. Thereafter, to meet the requirements of section 88 of the General Municipal Law, the defendant divided the work of the project into four separate parts and, after the issuance of specifications for each part, it advertised for bids upon four separate contracts to be performed in constructing the addition to Public School 35  (1) general construction work, (2) plumbing and drainage, (3) heating and ventilating, (4) electric work and lighting fixtures. Our problem relates itself to the contract last mentioned above  electric work and lighting fixtures  which, as will presently appear, was awarded to the plaintiffs in circumstances which gave rise to the present litigation.
There was undisputed testimony by the defendant's superintendent and its assistant superintendent in charge of design and construction of school buildings, that in arranging for public building construction  as here involved  where the work is to be accomplished under four separate contracts, the work of all the contractors must be integrated to assure completion within the contract time; and that, in the present case, at the time when the four separate contracts were advertised it was the intention, in accord with "normal procedure", to award all four contracts at about the same time.
When, however, the bids were received on the addition to Public School 35 the lowest qualified bid upon each of the four separate contracts and the total of those four bids were as follows:

 General construction $1,191,840
 Plumbing and drainage 78,000
 Heating and ventilating 178,300
 Electric work and lighting fixtures 83,500 (plaintiffs' bid)
 __________
 $1,531,640

As the total bids received on the four contracts exceeded the amount approved by the board of estimate on June 13, 1946, the defendant, on July 10, 1946, adopted a resolution requesting the board of estimate to increase the total estimated cost of the school addition from $960,000 to $1,538,340  an amount in *125 excess of the sum appropriated in the 1946 capital budget. On July 18, 1946, the defendant applied to the Federal Civilian Production Administration for a permit to build the proposed addition to Public School 35, such permit being required by a Federal regulation then in effect governing public building construction. In that application the defendant stated that the estimated cost of the Public School 35 addition was $1,050,000; that under the proposed schedule of work the project would be completed 450 days after construction commenced, and that "The appropriation of the money for the construction of this school has been made by the City". At its meeting of July 25, 1946, the board of estimate considered and took action upon a letter, addressed to it by the defendant's secretary, which reviewed the defendant's action in reference to the proposed addition to Public School 35, and set forth the bids which had been received on July 8, 1946 on the four separate contracts. As the letter suggested procedure later followed by the defendant, of which the plaintiff now complains, we regard statements made therein to be worthy of quotation. After stating that bids for heating and ventilating work had been rejected as unqualified, and that funds available for the project would be insufficient to defray the cost of the proposed work, the defendant's letter stated:
"Accordingly, the Department proposes to award contracts for general construction and electric work and lighting fixtures at this time in the total amount of $1,275,340. An additional appropriation in the sum of $287,803, chargeable to the Amended 1946 Capital Budget, and added to the $1,014,000 available would provide sufficient funds to defray the cost of the two contracts proposed to be let. The remaining two mechanical contracts would be let at some future date, dependent upon another amendment of the Amended 1946 Capital Budget to provide additional funds. Readvertising will be required for the heating and ventilating work as the Department has rejected all bids, and the same may be necessary for the plumbing and drainage work as the 45 day limit on holding a low bidder after receipt of bids may expire before additional funds are made available.
*126
"The Board of Education is of the opinion that the bids received reflect present trends in building construction, and that awards at this time would be in the best interests of the Board of Education and the City.
"It might be added that the general impression is that said trend is upward, with no indication that there will be a reversal or leveling off in the near future. Furthermore, the experience of other City agencies indicates that no savings are obtained upon readvertising.
"While the proposal to let only general construction and electrical work at this time is not considered best practice for building construction, which is a highly integrated process, there appears to be no alternative to such procedure except deferment of the entire work until conditions are more favorable.
"If work proceeds now, and on the basis proposed, the City may expect increased construction costs as well as additional engineering expenditures attendant upon construction not being fully integrated, and extending over a longer period. * * *
"As noted herein, the sum of the low bid for general construction and the lowest responsible bid for electrical work is $1,275,340. The allotment proposed in the Amended 1946 Capital Budget is $287,803.13, which together with the approximately $1,014,000 available funds, would provide a total of $1,301,803, or $26,463 in excess of that required for the two contracts proposed. This balance could be used for possible contingencies.
"No approval is required, or possible at this time, of the requested revised aggregate estimated cost of $1,538,340 for general construction and all mechanical contracts until sufficient funds are made available in the future."
Acting upon the foregoing recommendations by the board of education, no action was taken by the board of estimate to assure the integration of the work to be separately undertaken by the four contractors who had submitted the lowest bids. Instead, the board of estimate appropriated an additional $287,803 for the Public School 35 addition and approved increased estimates of cost on only two of the four contracts, viz., $1,191,840 for general construction work and $83,500 for *127 electric work and fixtures. That approval was granted "with the understanding that an increased aggregate estimate of cost will be approved at a later date as funds are made available". On July 30, 1946, the Civilian Production Administration approved defendant's application for a building permit for the addition to Public School 35, which approval contained the following statement: "You are hereby authorized * * * to construct the project or do the work described in this application, subject to these conditions: The Civilian Production Administration in granting this authorization relied on the statements and representations made by the applicant; failure to abide by these statements and representations * * * constitutes a violation of this authorization and grounds for its immediate cancellation."
On the following day, July 31, 1946, the defendant awarded the contract for general construction work on Public School 35 to John T. Brady & Co. and on the same date awarded to the plaintiffs the contract for electric work and lighting fixtures.
It is appropriate to interrupt the narrative at this point to state that at the trial herein the plaintiffs introduced testimony by the assistant superintendent of school buildings employed by the defendant that the decision of the board of education on July 30, 1946, to award at that time only the contracts for general construction work and electric work and lighting fixtures, constituted a change of plans after the time the bids were received, which change was made necessary by the lack of available funds sufficient to cover the cost of all four contracts. According to the minutes of its meeting held on July 31, 1946, when the defendant again reviewed what had occurred in connection with the addition to Public School 35, a request to the city planning commission was authorized for an amendment of the 1946 capital budget sufficient to make available the total cost of the project. The city planning commission, however, declined to make the recommendation necessary to an amendment of the capital budget of 1946 and no additional funds were made available in that year to meet the cost of the addition to Public School 35.
On August 1, 1946, plaintiffs received notice from the defendant that the contract for installation of electric work and lighting *128 fixtures in the Public School 35 addition had been awarded to them on the preceding day, and that the contract for such work should be executed within five days under penalty of forfeiture by plaintiffs of their bid deposit. The contract was executed by the parties to this action on August 5, 1946.
There is evidence, however, from which the jury could find that the defendant did not inform the plaintiffs, either prior to or at the time of signing the contract for electric work and lighting fixtures, that the award of the contracts for plumbing and drainage and for heating and ventilating was to be delayed for an indefinite period until sufficient funds were available to cover the cost thereof. Indeed, those two contracts were not awarded until January 20, 1947, five months after approval of the two contracts for electric work and general construction and after there had been included in the 1947 capital budget funds sufficient to defray the expense thereof and the appropriation of such funds by the board of estimate on January 16, 1947. Those two contracts were finally approved by the comptroller and the commencement of work thereunder was authorized on February 4, 1947.
Meantime, on August 27, 1946, the defendant by its secretary sent to plaintiffs a formal notice that the contract for electric work and lighting fixtures  upon which they had been the low bidder  had been approved on that date by the city comptroller "* * * and is therefore a valid contract." The notice also stated: "The contract time [450 days] begins to run from the date of this notification". On the same date (August 27, 1946) the comptroller indorsed upon the plaintiffs' contract his certificate as follows: "In pursuance of the provision of Section 93c-3.0 of the Administrative Code of the City of New York, I hereby certify that there remains unapplied and unexpended a balance of the appropriation of fund applicable to this contract sufficient to pay the estimated expense of executing the same, viz.: $83500". (Emphasis supplied.) The plaintiffs were first able to perform work under their contract on April 14, 1947; they completed their work in February, 1949  880 consecutive calendar days after the approval of the contract on August 27, 1946. For complete performance of their contract they were paid by the defendant $83,500  the original *129 contract price agreed upon. Thereafter plaintiffs instituted the present action to recover $45,237.94, that sum being arrived at by deducting from the alleged fair and reasonable value of work performed by them in connection with the addition to Public School 35, viz., $128,737.94, the sum of $83,500, being the contract price received by them.
It is the plaintiffs' position that by the information and data furnished by the defendant at and prior to the time they submitted their bid on the contract for electric work and lighting fixtures, the defendant impliedly represented to them that the construction of the addition to Public School 35 would require the integration of the various types of work involved in the project and close co-ordination between the four contractors who would perform that work, and to that end the four contracts to which reference has been made  on which bids were sought at the same time  would be awarded at or about the same time. The plaintiffs' claim is that they relied on that implied representation when they prepared their bid for the work they undertook to do, and when they signed the contract therefor; that the defendant, at a time when it knew that the award of two of the four contracts would be delayed indefinitely, failed to advise the plaintiffs of that fact before they executed their contract; that defendant's failure to inform the plaintiffs of such impending delay in the award of the remaining two contracts was in effect fraud which caused serious interruptions and long delay in carrying out their plan of work to meet the obligations they had assumed and ultimately fulfilled, and resulted in increased cost to them for labor and materials they have furnished to the finished project.
At the trial, in addition to testimony to which reference has been made, the plaintiff Morton Bank testified that it was usual procedure for the defendant to advertise and award the four contracts simultaneously and that, at the time plaintiffs made up their bid, they assumed that  inasmuch as all four contracts covering the work required for the school addition had been advertised together  the four contracts would be awarded at about the same time and work on the whole project would begin promptly. The plaintiffs also considered the time for completing the contract as fixed in the instructions to bidders *130  450 days  as an important factor to be considered in determining their estimate of cost of labor and material before submitting their bid. There was uncontradicted testimony from a number of witnesses that in the erection of a school addition the work is an integrated process which requires co-ordination of the various types of work and installations required of each contractor. In fact, in connection with the time limit of the job being fixed at 450 days, the instructions to bidders gave notice that plaintiffs would be required to co-ordinate their work with other contractors "* * * so that all work shall be completed simultaneously with the substantial completion of the General Construction work * * *." Furthermore, as if effectively to forestall any lack of co-ordination, and certainly affording the plaintiffs a valid basis for their assumption that all four contracts were to be awarded at about the same time, the contract which plaintiffs were called upon to sign, and did sign, five days after they received the notice of August 1, 1946, under penalty of forfeiture of their bid deposit, contained the following provision: "29. CO-OPERATION WITH OTHER CONTRACTORS.  (a) Inasmuch as the completion of the building within the prescribed limit of time is dependent very largely upon the close and active co-operation of all those engaged therein, it is therefore expressly understood and agreed that the Contractor shall lay out and install his work at such time or times and in such a manner as not to delay or interfere with the carrying forward of the work of the Contractors for General Construction, Plumbing and Drainage, and Heating and Ventilating." (Emphasis supplied.)
It is difficult to understand how plaintiffs could maintain "close and active co-operation" with "all" the other three contractors expressly referred to in the contract when, to the defendant's knowledge at the time the contract was signed, there was to be only one other contractor for an indefinite time in the future.
In its charge, the court at Trial Term submitted to the jury, as a guide for their deliberations, and without exception by the defendant, the following four questions, the instructions being that, if they answered any one of the questions in the negative, their verdict should be for the defendant, and that, if they *131 answered each of the questions in the affirmative, their verdict should be for the plaintiffs in the amount of increased cost of labor and materials to which plaintiffs were subjected as a result of defendant's failure to award all four contracts at once or to advise the plaintiffs that all four contracts were not so awarded:
"1. Were the circumstances such that the Board of Education impliedly represented to the plaintiffs that all four contracts would be awarded at once.
"2. Did the plaintiffs believe and rely upon that representation.
"3. Did the failure of the Board to award all four contracts at once, or advise the plaintiffs that all four would not be awarded at once, amount to a fraud upon the plaintiffs.
"4. Did the failure of the Board to award all four contracts at once or advise the plaintiffs that they would not be so awarded, subject the plaintiffs to increased costs for labor and materials."
When, during their deliberations, the jury requested the Trial Justice to repeat the questions he had formulated for their guidance, he complied with their request and added the following instructions which, in the absence of an exception to any part thereof, become the law of the case: "I also repeat what I said on the subject of fraud, that a mere breach of contract, a mere failure to perform a promise, is not a fraud. Fraud consists of inducing action by a false representation as to an existing fact. But a state of mind is a fact; and a representation that one intends to do a thing when in fact there is no intention to do that thing, is a false representation as to an existing fact. So, too, a positive representation as upon knowledge, that a thing is to be done when in fact there is no such knowledge and no intention that that thing is to be done, may be found by you to be a fraudulent representation. Still further, if the Board in fact intended when they advertised for bids to award all four contracts at the same time, and represented that intention to the plaintiffs, but then changed that intention before plaintiffs executed their contract, and failed to advise the plaintiffs of that change of intention and allowed the plaintiffs to execute their contract, knowing that plaintiffs were executing *132 it in reliance upon a belief that all four contracts were to be executed at once, that failure to advise the plaintiffs of that change of intention may be found by you to constitute a fraud. That means that even if you find that a representation was made and that it was true when made, nevertheless if the representation became untrue before the plaintiffs executed their contract, and the Board failed to advise the plaintiffs that the representation had become untrue and allowed the plaintiffs to execute their contracts in the mistaken belief that all contracts would be awarded at once, then you may find that a fraud was committed."
The jury, apparently answering all four questions in the affirmative, returned a verdict for the plaintiffs in the amount of $16,000. At the Appellate Division, the judgment was reversed, two Justices dissenting, and the complaint was dismissed on the law and the facts, upon the grounds, stated in the opinion, that plaintiffs had failed, as a matter of law, to establish actionable fraud on the part of the defendant and that there had been no causal connection established between the alleged fraudulent representation by the defendant and the increased costs to which plaintiffs were subjected. Our reading of this record has led us to a contrary conclusion.
We do not think the plaintiffs were required to do more than they did to acquaint themselves with the status of the policy by which the addition to Public School 35 was being financed. With full knowledge before the contract here involved was signed that funds were not available to meet the entire cost of the addition to Public School 35, the defendant did not reject the bids upon all four contracts; nor did it inform the plaintiffs of its plan  made after the four bids were received  to award only two of the four contracts. Instead, as we have seen, the defendant on July 31, 1946, awarded to the plaintiffs the contract for electric work and lighting fixtures, notified them to execute the contract within five days under penalty of forfeiting their bid deposit, and sent them a formal written notice on August 27, 1946 that the agreement had been approved, that it was "a valid contract", and that the contract time for performance (450 days) began to run on the date of that notification. That contract bore the indorsement by the comptroller, *133 quoted (supra), which certified that there "remains unapplied and unexpended" a balance of the appropriated fund applicable to plaintiffs' contract "sufficient to pay the estimated expense of executing the same, viz.: $83500". "Such indorsement", according to the statute cited by the comptroller as authority for his certificate, "shall be sufficient evidence of such appropriation or fund in any action" (Administrative Code of City of New York, § 93c-3.0, subd. c).
Mindful, as we are, that "Men must turn square corners when they deal with the Government", Rock Island, A. & L. R. R. v. United States (254 U. S. 141, 143), we do not think the plaintiffs were required to look beyond the comptroller's certificate, indorsed upon their contract, to ascertain whether sufficient funds were then legally available to meet the cost of work to be done under the other three contracts. In our view the plaintiffs were justified in assuming that the defendant  which had prepared the contract requiring plaintiffs so to progress their work and installations thereunder "* * * as not to delay or interfere with the carrying forward of the work of the Contractors for General Construction, Plumbing and Drainage, and Heating and Ventilating"  had not postponed the award of contracts to those three contractors with whom plaintiffs were required to co-ordinate their work.
Knowing, as did the defendant, before the plaintiffs' contract was executed, that funds were then lacking sufficient to meet the known cost of constructing the addition to Public School 35, and having then concluded to change its plans and to delay indefinitely the award of two of the four contracts, each of which called for integrated work and co-ordination by the plaintiffs, the defendant should not have withheld from plaintiffs information as to a change in plan so vital as to make inappropriate the basis of plaintiffs' bid. Silence by the defendant as to a change in plans so important to the timely performance of the work plaintiffs were about to undertake served to mislead them into a false assurance that the work contemplated by their bid would progress according to plan along with the integrated work of the other three contracts. True, no duty rests upon a party to a contract to speak where silence does not constitute deception. Silence may, however, *134 constitute fraud where one of two parties to a contract has notice that the other "* * * is acting upon a mistaken belief as to a material fact" (Donovan v. Aeolian Co., 270 N.Y. 267, 271).
The defendant's position is not strengthened by its assertion that in 1946 there was statutory authority for the rejection by a city agency of any and all bids upon a public contract. The provision of statute upon which the defendant relies  section 343 (subd. b) of the New York City Charter  which authorizes a city agency to "reject all bids if it shall deem it for the interest of the city so to do", is made inapplicable to the board of education by section 349 of the city charter. The provision in subdivision 10 of section 2556 of the Education Law that "The board may reject all bids and re-advertise for new bids" was not added to that section until 1950 (L. 1950, ch. 156).
The judgments should be reversed and a new trial granted, with costs to abide the event.
DESMOND, J. (dissenting).
I dissent and vote to affirm on both grounds set forth in the majority opinion of the Appellate Division: first, that there was no proof of any fraud, actual or constructive, and, second, that there was no proof that the board's conduct caused any damage to plaintiffs. As to fraud or misrepresentation, I call attention, particularly, to these two undisputed facts: first, that the board not only did not agree to let all the contracts simultaneously but expressly reserved the right to reject any and all bids, and, second, that before the contract was signed by plaintiffs, they were on notice, from proceedings of both the board of estimate and the board of education, that two contracts only were to be let, at that time.
Judgments reversed, etc.